UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

NAILCARE ACADEMY LLC and
JANET MCCORMICK, a Florida
limited liability company,

    Plaintiffs,

v.                                                          Case No.:  2:21-cv-405-SPC-NPM

MEDINAILS, INC and ROBERT
SPALDING,

    Defendants.
_____/

## OPINION AND ORDER[1]

Before the Court is Defendants Medinails, Inc. and Robert Spaulding's Motion to Transfer (Doc. 22). Plaintiffs Nailcare Academy LLC and Janet McCormick responded in opposition (Doc. 28). The Court grants the Motion.

## BACKGROUND[2]

This is a trademark infringement, unfair competition, and contract case. All parties are in the nail business, specifically teaching others how to care for nails. McCormick and Spaulding formed a partnership in 2008 (the

---

[1] Disclaimer: Documents hyperlinked to CM/ECF are subject to PACER fees. By using hyperlinks, the Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide, nor does it have any agreements with them. The Court is also not responsible for a hyperlink's availability and functionality, and a failed hyperlink does not affect this Order.

[2] These are facts alleged (Doc. 1).

"Partnership"). Things soured and litigation followed. In 2015, the suit settled: McCormick sold her interest to Spaulding and the parties dissolved the Partnership. A settlement memorialized the terms (the "Agreement").

In part, the Agreement divided intellectual property. McCormick took all rights associated with the trademark and copyright for an advanced nail technician ("ANT"). Spaulding got all trademark and copyright revolving around a medical nail technician ("MNT"). The Agreement also contained a forum-selection clause ("FSC") and set boundaries on the parties' future relationship. After McCormick and Spaulding went their separate ways, they continued working in the nail industry through the corporate parties.

Nailcare used the ANT trademark since 2009 and later registered it. The same is true for Nailcare's registered "SAFE SALON" mark. Still, Defendants marketed products with similar names, thus infringing on those marks. Defendants also breached the Agreement by using Plaintiffs' materials and failing to pay amounts due. So Nailcare sued Medinails for infringing on the ANT mark (Count 1); infringing on the Safe Salon mark (Count 2); and unfairly competing by using various infringing marks (Count 3). And McCormick sues Spaulding for breaching the Agreement (Count 4).

Now, the parties dispute whether the FSC requires transferring this action to Tennessee.

## LEGAL STANDARD

When an FSC points to another federal court, the proper enforcement mechanism is a motion to transfer under 28 U.S.C. § 1404(a). *Atl. Marine Constr. Co. v. U.S. Dist. Ct., W. Dist. of Tex.*, 571 U.S. 49, 52, 59-60 (2013). That provision follows: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Under § 1404, district courts have somewhat broad discretion. *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988).

In applying the statute, many courts use a two-step approach. *Gaby's Bags, LLC v. Mercari, Inc.*, No. 2:19-cv-785-FtM-38MRM, 2020 WL 495215, at *2 (M.D. Fla. Jan. 30, 2020). The first question is whether the case might have been brought in the transferee district or the parties consented to suit there. *Epler v. Air Methods Corp.*, No. 6:21-cv-461-PGB-DCI, 2021 WL 2806207, at *2 (M.D. Fla. June 4, 2021). At the second step, courts consider several factors related to convenience and the interest of justice. *Id.*

## DISCUSSION

It is unclear whether Defendants believe venue is proper here. *Compare* (Doc. 22 at 4 n.4), *with* (Doc. 23 at 2). But that is irrelevant. Beside a perfunctory, alternative request buried within a footnote, the Motion only

3

seeks transfer under § 1404. So it is unnecessary to address improper venue under 28 U.S.C. § 1406 or Rule 12(b)(3). And the Court follows the useful two-step approach applicable to § 1404 motions.

**A. Step One**

To start, Plaintiffs could have sued in Tennessee because it was a proper venue. Both Defendants are residents of Signal Mountain, Tennessee. The Court notices the location of that town (i.e., Hamilton County, which is within the Chattanooga Division). Fed. R. Evid. 201(c)(1). So venue exists there even without the FSC. 28 U.S.C. §§ 1391(b)(1), 1404(a).

Because an FSC is at issue, however, the Court addresses three other matters: whether the FSC is (1) mandatory; (2) applicable (i.e., the claims fall within its scope); and (3) valid.³ *E.g.*, *Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874-75 (D.C. Cir. 2019). If the answers are "yes," the clause is typically enforceable. *Atl. Marine*, 571 U.S. at 64. For reference, here is the FSC:

> Any action, suit or other proceeding arising out of or in connection with this Settlement Agreement shall be commenced only in the federal court sitting in Chattanooga, Tennessee, and the Parties each agree to submit to the personal jurisdiction and venue of that court.

---

³ As commenters note, *Atlantic Marine* glossed over the first step by presuming the FSC satisfied all three parts. *E.g.*, Matthew J. Sorensen, Note, *Enforcement of Forum-Selection Clauses in Federal Court After* Atlantic Marine, 82 Fordham L. Rev. 2521, 2553-56 (2014). The Court's analysis combines the traditional § 1404 inquiry with three crucial questions not discussed in *Atlantic Marine*. Then, it turns to the modified second-step inquiry.

(Doc. 1-4 at 8).

1. *Mandatory*

It helps to begin with the simplest issue—whether the FSC is mandatory or permissive.  *See Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330 (11th Cir. 2011).  In this context, "the term shall is one of requirement." *Slater*, 634 F.3d at 1330 (cleaned up).  And the Agreement added "only" for good measure.  There is no doubt any action within the scope must be filed in Tennessee. *Glob. Satellite Commc'n Co. v. Starmill U.K. Ltd.*, 378 F.3d 1269, 1272 (11th Cir. 2004) ("The contract provision, . . . because it uses the imperative 'shall,' is most reasonably interpreted to mandate venue [there] alone.").  With that decided, the Court turns to the heart of the dispute.

2. *Applicable (Scope)*

Courts look at each claim individually to determine whether it falls within an FSC. *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1317 (11th Cir. 2013).  Settlement agreements—like the Agreement—are just contracts subject to the regular rules of interpretation. *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1290 (11th Cir. 2004).  And the goal is to effect a contract's plain language. *Brown Jordan Int'l, Inc. v. Carmicle*, 846 F.3d 1167, 1179 (11th Cir. 2017).[4]

---

[4] Tennessee law likely applies for interpreting the Agreement.  Yet the parties make no argument on it.  So the Court assumes there are no relevant, distinctive aspects of state law

Count 4 is for breach of contract. It is hard to conceive of a claim more within the scope of an FSC than breach of the contract containing the clause. By filing Count 4 here, McCormick breached the Agreement. But the suit is proper, she says, "to promote judicial economy, as a cost savings measure for all parties." (Doc. 28 at 10). Simply put, McCormick misunderstands the law and has the matter backwards.

Count 4 is subject to the FSC. So the issue is not whether it would be more convenient or efficient to try Count 4 here. Indeed, courts cannot even consider judicial economy as a basis to ignore an enforceable FSC. *Atl. Marine,* 571 U.S. at 62 n.6, 64 (listing the public-interest factors).[5] If the Court considered judicial economy, the question becomes whether it is more efficient to transfer the other claims too—whether or not they fall within the scope of the FSC—because Count 4 must be in Chattanooga. Alternatively, the issue would be whether the "public-interest factors overwhelmingly disfavor" severing Count 4. *See In re Rolls Royce Corp.*, 775 F.3d 671, 681 (5th Cir. 2014) (explaining "the private factors of the parties who have signed [FSCs] must, as

---

and relies on general contract principles. *E.g.*, *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (Alito, J.).

[5] When the Supreme Court speaks of "administrative difficulties," it refers to those that "follow for courts when litigation is piled up in congested centers instead of being handled at its origin." *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947). For that reason, the typical analysis compares the filing statistics of the respective courts (as the parties did here). Outside some noncontrolling cases loosely citing judicial economy, Plaintiffs cite no binding law allowing courts to disregard valuable contractual rights for their own simple convenience.

matter of law, cut in favor of severance and transfer to the contracted for forum"). Given that enforcing FSCs "furthers vital interests of the justice system," McCormick did not come close to make that showing. *See Atl. Marine, 571 U.S. at 63* (citation omitted).[6]

In short, Count 4 is within the FSC's scope.

Next up are Counts 1 and 3. Respectively, those are for trademark infringement and unfair competition related to the ANT mark. According to Plaintiffs, these claims are outside the scope. Defendants disagree. Again, the FSC applies to all actions "arising out of or in connection with" the Agreement. (Doc. 1-4 at 8). Cases defined these and similar phrases.

"The term 'arising out of' is broad, but it is not all encompassing." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011). "When determining if a dispute arises out of . . . an underlying contract, we generally consider whether the dispute in question was an immediate, foreseeable result of the performance of contractual duties." *Hearn v. Comcast Cable Commc'ns, LLC*, 992 F.3d 1209, 1213 (11th Cir. 2021). "In other words, there must be

---

[6] Plaintiffs ignored Defendants' argument that Nailcare is bound by the Agreement. (Doc. 22 at 10 n.7). The Court interprets Nailcare's silence as acknowledging its rights are derivative of McCormick's. *See Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1299 (11th Cir. 1998); *Stiles v. Bankers Healthcare Grp., Inc.*, 637 F. App'x 556, 562 (11th Cir. 2016); *see also* (Doc. 28 at 16-17 (arguing the Agreement was a contract between Nailcare and Defendants)); (Doc. 22-1 at 9).

some direct relationship between the dispute and the performance of duties specified by the contract." *Id.* (cleaned up).

Counts 1 and 3 arise out of the Agreement. To infringe on the ANT mark or unfairly compete by using a similar mark was a foreseeable, direct result of Defendants' nonperformance of contractual duties. *See id.* The Agreement "divided the intellectual property assets of the Partnership between" McCormick and Spaulding. (Doc. 1 at 8). In doing so, it gave McCormick "a contractual right to the use of the [ANT] Mark." (Doc. 1 at 6); (Doc. 1-4 at 4 ("McCormick owns all rights and legal title (including, but not limited to, all copyrights or trademarks) to the" ANT mark.)). When Defendants infringed the ANT mark and used a similar one, they breached the Agreement (and vice versa). In other words, breach goes hand in hand with infringement and unfair competition here.[7] McCormick impliedly concedes this point in Count 4, alleging Spaulding breached (in part) by failing to transfer or assign the trademark rights he had in the ANT mark.

Nailcare argues its trademark rights are not limited to contract. Rather, they derive from use in commerce alone. That statement jumps the gun. It

---

[7] *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18:15 (5th ed. 2021 update) ("If the trademark . . . has been sold, the seller's later use of the trademark . . . is in derogation of the asset he sold to another, and constitutes *both* trademark infringement *and* breach of contract."); *see also* Raymond T. Nimmer & Jeff C. Dodd, *Modern Licensing Law* § 11:39 (2019 update) ("Stated simply, then, in a license relationship, both infringement and breach may result in cases when the defendant's conduct fails to perform a contractual obligation and infringes the exclusive rights of the rights owner.").

8

presupposes Nailcare is a senior user of the ANT mark with priority. But Nailcare only started using the ANT mark in 2009—after the Partnership formed. (Doc. 1 at 4; Doc. 1-4 at 2). So Nailcare's exclusive right to use the mark depended—at least in part—on the assignment of any rights Spaulding or the Partnership had. *See* (Doc. 1 at 4 (alleging Nailcare "has the exclusive right to use the ANT Mark . . . as stated in" the Agreement), 6 (Nailcare "is the senior user and possesses a contractual right to the use of the" ANT mark.)).[8] Counts 1 and 3 thus are "arising out of" the Agreement.

Even if they are not, Counts 1 and 3 are "in connection with" the Agreement. "Connected with" conveys "the necessity of some direct connection." *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1219 (11th Cir. 2011). Otherwise, "the term would be meaningless." *Id.* Importantly, however, "arising out of" and "in connection with" do not mean the same thing. *E.g.*, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 389 (2d Cir. 2007). That interpretation would render one surplusage—violating a cardinal tenet of contract interpretation. *Golden Door Jewelry Creations, Inc. v. Lloyds Underwriters Non-Marine Ass'n*, 117 F.3d 1328, 1338 (11th Cir. 1997).

As Plaintiffs concede, the phrase "in connection with" broadens the scope of claims to which the FSC may apply. Yet they're right the FSC's reach is not

---

[8] Again, Plaintiffs ignore the relationship between McCormick and Nailcare. It is unclear if Nailcare even existed in 2009 or if McCormick assigned Nailcare her rights to the ANT mark.

9

limitless. *Bah. Sales Assocs., LLC v. Byers*, 701 F.3d 1335, 1340-41 (11th Cir. 2012). For instance, "the fact that a dispute could not have arisen but for an agreement does not mean that the dispute necessarily 'relates to' that agreement." *Id.* at 1341.

In this context, the Eleventh has not specifically defined the phrase "in connection with." *But cf. Hunstein v. Preferred Collection and Mgmt. Servs., Inc.*, 17 F.4th 1016, 1034 (11th Cir. 2021) (using dictionary definition of phrase for statutory interpretation), *vacated on other grounds*, 17 F.4th 1103. Still, other circuits provide guidance. One explained, the term "reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract." *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999). Another, surveying cases, said the phrase fits "if 'the origin of the dispute is related to [the contract],' meaning it 'has some logical or causal connection' to the" contract. *Azima,* 926 F.3d at 877 (quoting *John Wyeth,* 119 F.3d at 1074); *see also Coregis Ins. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-30 (2d Cir. 2001).

Whatever the precise definition, the FSC applies to "[a]ny action" connected with the Agreement. (Doc. 1-4 at 8). The Eleventh just interpreted a similar clause ("any issues or disputes in connection with" a contract). *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1299 (11th Cir. 2021). *Don't Look* emphasized that "any means all." *Id.* (cleaned up). There, plaintiff's

RICO claims revolved around defendant's fraudulent promises made in an earlier contract between the parties. On those facts, *Don't Look* held the extracontractual RICO claims fell within the FSC scope because they were "in connection with" the contract. *Id.*

The answer here is the same. The Agreement wound up and dissolved the Partnership. It also divided intellectual property—giving McCormick exclusive rights to the ANT mark. By ending their business relationship, Spaulding promised not to use the ANT mark. So the infringement and unfair competition claims for that mark are directly connected to "the business relationship evidenced by the contract." *Id.* (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1070 (11th Cir. 1987) (en banc)); *see also Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1331 (11th Cir. 2011); *Frida Kahlo Corp. v. Pinedo*, No. 18-21826-Civ-Scola, 2021 WL 4147876, at *2-3 (S.D. Fla. Sept. 13, 2021) (holding infringement claims fell within scope of FSC in contract assigning the marks). And these claims are safely "in connection with" the Agreement that split the intellectual property. *See Azima*, 926 F.3d at 877.

So Counts 1 and 3 fall within the scope of the FSC.

Finally comes Count 2. That alleges trademark infringement of the Safe Salon mark. The Agreement does not mention that mark. What's more, Medinails does not discuss it. So Nailcare says it cannot fall under the FSC. The Court disagrees.

11

While the Motion may not address Count 2, the Answer and Counterclaims do. (Doc. 23). According to Medinails, the Safe Salon mark was Partnership property. In fact, it wants to cancel Nailcare's registration over that fact. If true, the mark might be Spaulding's (or an assignee's) because he bought McCormick's Partnership interest. Or the mark could be general Partnership property distributed upon dissolution. *See* J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* §§ 16:42, 16:44 (5th ed. 2021 update) (explaining the trouble splitting mark after partnership dissolution). Either way, the Agreement and facts surrounding the Partnership are vital to understanding the ownership of the Safe Salon mark. And the Defenses and Counterclaims clarify Count 2 is inside the scope of the FSC. *See, e.g.*, *Frida*, 2021 WL 4147876, at *3 ("As the Plaintiffs' claims regarding the assigned marks depend on a resolution of the Defendants' argument concerning ownership of the marks, as interpreted in the Assignment, the [FSC] controls.").[9]

In short, the FSC applies to all claims because they fall within its scope.

---

[9] *See also* *Omron Healthcare, Inc. v. Maclaren Exports Ltd.*, 28 F.3d 600, 601-03 (7th Cir. 1994) (holding FSC in distribution contract governed later trademark-infringement suit); *Crescent Int'l, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943, 944-45 (3d Cir. 1988) (applying FSC even though "only one of [plaintiff's] claims is based on a breach" because "all of them involve allegations arising out of the agreement implicating its terms"); *see also* *In re Remicade (Direct Purchaser) Antitrust Litig.*, 938 F.3d 515, 524 (3d Cir. 2019) (concluding FSC controlled because extracontractual claims could not "be adjudicated without reference to, and reliance upon" the contract (cleaned up)).

*3. Valid*

Finally, FSCs "are presumptively valid and enforceable unless the plaintiff makes a 'strong showing' that enforcement would be unfair or unreasonable under the circumstances." *Krenkel v. Kerzner Int'l Hotels Ltd.,* 579 F.3d 1279, 1281 (11th Cir. 2009) (quoting *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 593-95 (1991)). But these clauses are not impregnable. An FSC "will be invalidated when: (1) its formation was induced by fraud or overreaching; (2) the plaintiff would be deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene public policy." *Id.* (quoting *Lipcon,* 148 F.3d at 1296).

Plaintiffs say the FSC violates public policy. But they make no strong showing for invalidation. In fact, they make no showing at all. Unlike a fine-print FSC within an adhesion contract—which are regularly upheld—McCormick and Spaulding negotiated for the Tennessee forum. The Agreement was a comprehensive contract (presumably prepared by lawyers) that stipulates to the FSC. Yet according to Plaintiffs, enforcement violates public policy because Defendants seek to transfer claims outside the FSC scope. As detailed above, that is incorrect.

To the extent that Plaintiffs argue enforcement of the FSC deprives them of their "venue privilege," the position is a nonstarter. *Atlantic Marine*

13

explains McCormick "effectively exercised" that privilege by contracting for the FSC. 571 U.S. at 63. With no other argument, the FSC is valid.

Having concluded the FSC is mandatory, applicable, and valid, the Court finds it is enforceable. *See Azima*, 926 F.3d at 874-75. And the inquiry pivots back to § 1404(a).

**B. Step Two**

At this point, courts consider convenience of the parties and witnesses, along with the interest of justice. 28 U.S.C. § 1404(a). When transfer is based on an FSC, however, the "calculus changes." *Atl. Marine,* 571 U.S. at 63. For instance, courts cannot consider plaintiff's choice of forum. *Id.* at 63-64. And the private-interest factors automatically favor transfer. *Id.* at 64. So courts simply consider public-interest factors—i.e., "the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; and the interest in having the trial of a diversity case in a forum that is at home with the law." *Id.* at 62 n.6 (cleaned up). "Because those factors will rarely defeat a transfer motion, the practical result is that [FSCs] should control except in unusual cases." *Id.* at 64.

Plaintiffs fail to meet their heavy burden. *See id.* at 62 (explaining the burden is on the party opposing valid FSC's enforcement). As the parties' show, no meaningful difference in court congestion could impact this case. What's more, Tennessee has a greater interest than Florida in resolving this

case because it inevitably involves the Partnership windup and Agreement—which all occurred in Tennessee. Finally, this is mostly a federal-question, not diversity, case. So there is little to no interest in either forum being "at home with the law." If there is, however, Tennessee has a greater interest because that state's law likely governs the Agreement.

At bottom, the relevant factors do not overwhelmingly disfavor enforcing the FSC. So transfer is appropriate. *See id.* at 67.

Accordingly, it is now

**ORDERED:**

1. Defendants' Motion to Transfer (Doc. 22) is **GRANTED**.

2. The Clerk is **DIRECTED** to **TRANSFER** this action to the United States District Court for the Eastern District of Tennessee, Chattanooga (Southern) Division.

3. The Clerk is **DIRECTED** to **CLOSE** the case. In doing so, the Clerk is **DIRECTED** to **MOOT** any pending motions and **TERMINATE** all deadlines that remain on the Fort Myers docket.

**DONE** and **ORDERED** in Fort Myers, Florida on January 6, 2022.

*[Signature]*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record